Good morning, Your Honors. May it please the Court, my name is David Lee Partito and I'm appearing today for Alex Pedrin. This case, like several that have come before the court in the last two years, places the court at an important juncture in our constitutional and law enforcement history. To paraphrase Judge Reinhart, in his dissent from the denial of en banc re-hearing in the Black case, the question at its broadest scope is, what are the limits on how the government may treat its citizens? These cases have common elements. All of them involve a crime that is orchestrated, planned, and promoted by a government agent. In fact, in many cases, the same government agent. One of the reasons these cases, I believe, are coming before the court is because of this development in law enforcement, which raises these issues that haven't really been starkly presented in years past. But they all of these cases have differences as well, and we know that differences matter, that the factual patterns of these cases can distinguish them from each other, because this is a fact-based inquiry. So how is this case different from Black? Thank you, Your Honor. I'll be glad to answer that. The differences relate to several areas. Let me start with the one that probably is going to be cited by the government to make this case not as egregious as Black, and that is the targeting or the recruitment of the targets. In Black, there was trolling. A CA or CI was brought in from out of State. Same one. Same one. Yes. Yes. No, the agent was the same one. I don't know. Oh, I'm sorry. The same agent. Yes, I'm sorry. I don't know that the CI was the same one. I doubt it. No, I'm sorry. I'm an agent, but you said CI very clearly. The initial inquiry in Black came from the government, right? The initial inquiry came from the government in Black, and it came from the government here as well. In this case, Agent Zayas or Zayas came from out of State, came to Tucson, Arizona, inquired of local law enforcement, who do you have any CIs that I can talk to that can bring me potential targets. The difference between the two cases there was the CI didn't just go to bars. He testified that he received a phone call from his nephew. Now, the key point, though, is that in both cases there was really no guidance given to the CI. In fact, one could argue that the recruitment in this case was worse. Here you turn the matter completely over to the CI. You give him no directions at all. His prejudices, his predilections can be given full reign. And who does he bring? He brings a family member, which involves the government in perhaps another level of questionable behavior. The main differences between the cases, and what makes this case worse, is that in Black there was a great deal of discussion initiated by the defendants after the initial approach by the agent. So they talked in detail about what crimes they had committed in the past, what guns they had used. They described them in detail. They talked about methods that they had used and methods they might use in this case in Black. They talked about possible scenarios involving hostages that they might use in this case. And then they finally laid it all out in the presence of the agent and talked about the various roles each person was going to perform. The government, therefore, had a great deal more information at an early stage in Black than it did in the Pedrin case. So the test, the six-part Black test, and I know there's some controversy as to whether, you know, in this circuit as to whether it should be used, but it is the majority opinion, focused on the known criminal characteristics of the defendants and individualized suspicion of the defendants. Those were the first two elements of the test. What the Court said in Black, what the majority said was, well, the agent may not have had this information before he approached the target, and there was some controversy over whether that was true or whether that was necessary or not. But he – but they talked often and early, I think was the phrase, often and early about their expertise and experience. That simply didn't happen. There was very little of that. In fact, there was far less than you would expect given Terry Bombard's later testimony at the hearing and at trial about all of the – all of the crimes he and Mr. Pedrin had supposedly committed. You would have expected it from that, and yet you had very little boasting, bragging, call it puffery, whatever information it was. So the controversy in Black was largely over whether we should rely so heavily on the statements made by the target defendants themselves, whether we can rely on that, whether – isn't it just really just mostly boasting and bragging and puffery? Here we don't even have the boasting and bragging and puffery. We have very little. What we had instead and what the district court judge relied on was information that came after the fact. And that's why we don't have Bombard's testimony about all of these supposed previous incidents, but that was not information known to the agent at any time during the investigation. Sotomayor What information was known to the agent at the time of planning and leading up to the actual arrest that would show that these people were sort of ready, willing, able, had some history? I mean, what kind of information of that variety did the agent have? Verrilli, The agent had very little and very general information. Statements such as, I've got everything ready to go. How are we – and the agent tried to elicit that information. I'm sure that was part of the plan. He asked at one or more meetings, what exactly are you going to do? And again, the answer was very vague and general. Well, we're going to go in and put people down and make them tell us where the drugs are. Everything else, virtually everything else in this case, came from the agent. The entire plan came from the agent. The information the agent had to indicate that these people were engaged in any kind of an ongoing criminal enterprise or had committed these kinds of crimes before, which is the standard, was virtually nil. I mean, there was essentially nothing. That came later from Bombard. The other thing that is important, I believe, is that the role that the government played, and that's another test. Obviously, there was encouragement, and obviously the government's role in creating the crime was the same as in Black. And the economic encouragement was greater than in Black. One of the details that may have escaped notice was, and I didn't notice it until reviewing the record a few days ago, was that the amount of drugs was quite a bit greater, the amount of hypothetical fictitious drugs was quite a bit greater in this case than in Black. In Black, I believe it was 20 to 25 kilograms of marijuana. Here, it was almost double. It was double that, 40 to 50. Why does that matter? It creates a greater inducement, Your Honor. And at some point, the – there are two ways it matters, actually. One is it creates a greater inducement, which means the likelihood of ensnaring an otherwise innocent person who wouldn't – who wasn't engaged in this kind of conduct, had no experience with it, and wouldn't do it but for the government inducement is greater. So it's a factor that should be considered. The second reason is it, as I think Gwen said, it jacks up the potential sentence. But in this case, it didn't, because the framework or the framing quantity is, I think, 15 to 50 kilos, and so in both cases, they're within that framework. That's true. It creates the potential for that. I mean, at some point, the government agent can say a larger amount. He could have said more than 50 kilos. But I don't see that in this one, he takes them up into the next sentencing category by bumping it up to 40. No, although certainly puts it in a very high sentencing category. But you're right about that. I think the primary difference between this and Black is that it creates a stronger inducement. The other thing is factor of the other way. Doesn't it also show a willingness to create or commit a crime that's that much more aggressive? That's the government's theory. But I guess I have my doubts about that. And the reason I do is, and I think the Court should view that skeptically, the reason is that if you offer someone a million dollars, you commit this crime and you're going to make a million dollars, or you offer them $50,000, yes, I guess at some level you could say that that means only the more serious people will apply. But it also means the inducement is greater. I mean, I might take the risk, if I'm in desperate straits, I might take the risk of getting shot or getting caught if it's a million dollars, whereas I wouldn't if it's $50,000. And while we don't have anything in the record here to indicate what the street value of this hypothetical cocaine would have been, it's a fair assumption it was well into the six figures. Kagan, I'm looking at page 7 and 8 of the opposing party's brief.  The defendant said that two other individuals would enter the residence. This is in response to the question of how you're going to do this. The defendant said that. Perez explained that he and another individual would be outside his lookout. Defendant said he wanted to get the stuff. I'll skip the profanity. And then when it skips over to the next page, Bombard said, we usually give up half in response to the question of, you know, how do you usually do this, how do you usually split the take. Well, I'm not saying there was no indication of boasting or puffing, but there was very little. What about this statement? Forgive me for interrupting. What about this statement, we usually give up half? There's a pretty clear indication, it seems to me, that this was not a first-time event for these folks. Well, it might be some indication of that. It might also be a way of saying, making yourself look more experienced, and saying this is how we'll we're very experienced operators. We do this all the time and this is how we do it, and we expect to get half, give up half, keep half. So defendant described himself as part of the entry team. Do you construe that to just mean that was the plan for this occasion as opposed to what they usually did on other occasions? I think it would be a stretch to say that that's what they were saying, that that's what they did on other occasions. I guess I'm my point is that the focus in Black was on the frequency, the vehemence, the enthusiasm, and the extreme detail that was provided from the mouths of the defendants themselves, and that simply didn't exist here. It was much vaguer. The nature of the government's participation was greater. Agent Zayas set the times of meetings. When two days went by and he had no contact from his targets, he instructed his C.I. to set a meeting. He told them when to go, where to go. And of crucial importance, when they refused, failed to follow him to what I'm calling the staging area, the place where they were going to be arrested or where they thought they were going to go just before the actual crime itself, when they drove in a different direction and went by that location, the record is very clear. He became a little upset. He was frantic. He was talking to the C.I. about get these guys back here. So that belied his assertion at trial and at the hearing that they could have walked away or driven away at any time. When they did drive away, they were still arrested. They were not given an opportunity to abandon it. And obviously, there are other issues such as the abandonment of the withdrawal from conspiracy instruction that address that. But that is related as well to the outrageous government conduct. Kennedy. But the abandonment here appears to have been I'm out of here because I smell a rat. Well, that was the assertion. But the fact is the fact is that though that they did not, as in Black, continue to the point of arrest, there were no guns recovered. In Black, there were four loaded weapons found in the trunk, a trunk full of weapons, essentially. So there's concern about all the areas that there was – there should be concern about all the areas there were in Black. There should also be concern about there being less here to give the Court solace. Ultimately, the government depended on one felon with a strong interest in giving up perhaps an innocent person. I mean, he gave them his nephew. Was there any reason to believe that Mr. Contreras would not have given up an innocent person to help his son, to provide them the thousands of dollars he was paid? They depended on a second felon. And I think the court's signal, the district court's signal error was depending on Bombard's testimony to show the lack of government overreaching or to mitigate the lack of overreaching. Okay. Let's hear from the government. We've taken you down to about six seconds. I'm sorry. Judge Noonan has a question. Thank you. In order to fight for your client, do we have to distinguish black? Are we compelled to follow black as the law unless we can make a distinction? Judge Noonan, we're having terrible trouble understanding you. Are you on speakerphone? I am. If you could put it off speakerphone and just talk into the receiver, it might be easier for us because we're having terrible trouble. It kind of cuts in and out. All right. I want to ask you, can we find for your client just not following black? Are we free to disregard black? Is black binding authority that we have to distinguish? Well, I've certainly attempted to distinguish black. I know you did, but do we have to do it in order to reach a result favorable to your client? I'm sorry. I didn't research that. Do we have to distinguish black in order to find for your client? I understand, Your Honor. My position would be you do not have to distinguish black, but I'll be honest with you, I haven't researched that issue. I believe different panels of this Court can reach different decisions. So I don't have binding authority. No, I don't believe black is binding authority, but I do believe there are distinctions.  Thank you. Okay. Thank you, Your Honor. Judge Nunez, with you not on speaker phone, we understood you perfectly. Okay. Good. Okay. Let's hear from the government. May it please the Court, I'm Bob Miskell from the U.S. Attorney's Office in Tucson on behalf of the United States. Welcome back. We saw you earlier in the week. It's great to be here again, Judge. Basically, this case is actually a much better case for the government than black. You've got very distinct things going on. First of all, there is no question that in this case the government infiltrated an existing home invasion operation. But what about the point that the government didn't really know that until afterwards? But one of the factors this Court has always looked at in looking at outrageous government conduct, going way back to the Bonanno case, is whether the defendant was involved in a continuing series of crimes and whether the government infiltrated an existing criminal organization. That is what happened here. Now, the government — But the question was, what about the fact that they didn't know that yet? They sent in this agent to, well, to do what he did in black, essentially. But isn't that why the initial inquiry is so important? But in this case, again, there is absolutely zero evidence of the trolling, the bars, et cetera, that you had in black. In this case, the existing home invasion crew approached the CI and said, we're looking — the nephew said to the CI uncle, we're looking for work stealing drugs. So that's what I'm referring to as the initial inquiry. Right. Does that mean the answer to my question is yes? Or did you not hear my question? I heard your question. I mean, I think you have to look at all the factors in the case in determining I mean, clearly, I'm not going to — I would not — I would not concede that the government cannot do a sting operation unless they know everything the defendants were involved in. My question is really quite different, and it's a simple question. It's not a tricky one, I promise. In this case, your thesis was that this is easier than black. And I'm asking whether it's your position that one reason it's easier is because the initial inquiry came from — not from the government. Oh, I'm sorry. I did misunderstand your question, Judge. No, that is one reason why it's easier. I'm sorry. I promise. I wasn't trying to be tricky. Why else might it be easier? What was — I interrupted you. I think you had a list. Well, you've got that. You've got the fact that it was an existing organization that had done ten prior home invasions. But they didn't know that before. That goes back to Judge Fletcher's point. They didn't know that yet. They didn't know that, but certainly you have to look at that factor in determining whether the government's conduct was so outrageous. You know — Well, they didn't know that yet. When did they find that out? They found that out when Bombard started cooperating, basically, after the arrest. That's not disputed. So don't we have to make this decision about whether the government's conduct was outrageous? Maybe you're viewing it retrospectively. It seems to me we need to know what they knew at the time. I think the way the whole concept of outrageous government conduct is structured is basically it's a question of is the — was the — did the defendant get due process? Was the process unfair to the defendant? If the defendant, in fact, is part of an existing criminal activity that the government successfully infiltrates, I don't think what the government knew affects whether the process was fair to the defendant or not. But, you know, that doesn't necessarily make sense. I understand we're dealing with kind of a fine-grained distinction. When did the government know that this was a sort of an active home infiltration gang? But if we're talking about outrageous government conduct, and outrageous government conduct is not synonymous with fairness to the defendant, it is outrageous government conduct — let's take an analogy, and that's clearly not this case. Let's say that we have an FBI agent who's staking out a house where there is someone quite dangerous. Someone drives up to the house, who walks toward the house, and the FBI agent, with his sharpshooter, shoots the person with no knowledge as to who this person is. Well, it turns out, after the fact, that the person that was shot was, in fact, the person who was dangerous, and they had the right to shoot. But does it make it any less outrageous that the FBI agent sharpshooter shot someone he hadn't — who had no idea who he was? I mean, if an FBI sharpshooter shoots somebody that had — he had no provocation to shoot — That's right. Yeah, that would be — That's outrageous, even if it turns out that he had authorization to shoot — I'm thinking of Ruby Ridge. He had authorization to shoot somebody. Turns out he shot the right person, but at the time he shoots, he has no idea who it is. Well, I think the government conduct in that situation is outrageous, even though it turns out that he shot the person he had the right to shoot. So to come back to this one, the government conduct may be outrageous, even if it turns out by chance afterwards we learn that had the government known what it learns later, it was okay. So I understand the distinction's a little bit thin, or a little bit — maybe I'll say it's a little bit subtle, but I think we're not wrong to focus on what did the government know at the time the government acted, rather than what the government learned later. Okay. Taking your premise, then you continue to go on. First of all, the informant was approached by the defendant's gang, let's say. Then they have a series of meetings with the undercover agent. In those meetings, I would characterize it kind of differently than Mr. Lipartito does. It's the inference you draw from those tape-recorded meetings is this group were professionals. They didn't have to engage in puffery. They were business. They were business in these meetings. What do they know? Can you be a little more specific about what statements in particular you're relying upon? Well, first they're talking about how they're going to go in, they're going to follow the agent into the residence, they're going to put everybody down on the ground, make them, tell them where the drugs were, and then take the drugs. They were adamant that they wanted to get the drugs. And then Bombard talks about how they always split it, how they split the proceeds of this criminal activity. Usually split it, he said. Yeah, usually split it, which again, this whole thing progressed with the, at each stage, convincing the undercover agent that he was dealing with experienced home invaders. Can I just take you back a step? I agree the plan was to go in after the agent, to follow him in. But that was his idea, right? That was the government's idea. So do you guys follow me in? No. As I read the transcript, it was the agent was asking, how are you going to do this? And the agent kept saying, I don't want to get shot in the head, basically, by you guys. But as I recall the transcript, it would say, we're going to go in after you. Because there was a discussion about whether they were going to wait until the agent came out to go in to get the drugs. Right. And they said, no, we're going to go in after you. And they emphasized to the agent that you have to act normal, because if you don't act normal, you'll tip them off. Right. I mean, that was them telling the agent what to do. Right. And then they, I just read the portion where they said, we're going to put everyone down and get the stuff. Do you have a record cite for the other statement? Which specifically? The statement, I recall it a little differently, and maybe I can just check it myself. But I thought it was the government's idea to say, you guys follow me in. I don't have the exact statement. It was in the transcript of one of the of the. I'll find it. Go right ahead. I don't want to use up your time. Okay. So you've got, as I said, every step of the way, they're acting as essentially a professional home invasion crew, which is what they were. And the agent was experienced. Clearly he realized that. So that's what separates or makes this case much, much stronger for the government than the Black case. And again, I think the fact that it was a home invasion crew certainly factors into the analysis. The Court, this Court has said that a claim of outrageous government conduct is basically an extremely high bar for the defendant to meet. And also the Court looks at the evidence in the light most favorable to the government. Using those standards, there was no outrageous government conduct here. The officers did a good job of infiltrating an established home invasion crew that had done at least ten home invasions and put a stop to it. Let me ask you a somewhat different question that's not the fine grain of distinguishing from Black, but it's a broader question on these sort of fictitious stash house cases, the reverse sting cases. Judge Noonan has made his position quite clear in his dissent in Black. I have to say that while I'm not sure I want to say that I am precisely in the same place legally, I do want to say I very much share Judge Noonan's feeling that these cases should not be brought. Are you continuing to do that in Arizona? I think there are still some in the pipeline, so to speak. I'm not sure. I can't say whether in those type of investigations it's still continuing. Yeah. I mean, I'll say only, I won't say very much, but for example, no bleeding heart, Judge Richard Posner on the Seventh Circuit says, law and economics, he's not really interested in protecting criminals, but it's just straight law and economics. He's saying the government is misguided here because it is engaging in sort of these setup and these sting operations. Sophisticated criminals will never raid stash houses because they know that these are setups. So what the government is doing, in fact, is protecting stash houses. So says conservative judge or relatively conservative judge Posner, who's no friend to the criminals. I mean, these cases are nuts in my view. Now, prosecutors get to do what they want to do. I understand that. But you also understand that the federal bench is, and I'm not alone on this one, Judge Noonan is not alone on this one, the federal bench is having real trouble with the sort of the fairness and the wisdom of these cases. And I understand that, Judge. The only counterpoint I would point out is home invasions do happen in Tucson. That is an established fact. They don't get reported. Yeah, but a home invasion is different from a stash house raid. I got that. But you go in, you go in and take a stash house, or the bad guys go in and rob a stash house, that's a dangerous event for the community. Of course it is. There are occasionally, unfortunately it happens, where they hit the wrong house. I mean, that has happened in Tucson. Of course. And those are the ones that get investigated, because, you know, if somebody goes into a stash house and steals drugs, that crime generally doesn't get reported, not surprisingly. So you've got these groups. Like, as an example in this case, they did 10 to 14 home invasions without drawing investigatory action, actually, because nobody reports it. And that is a problem, especially in Tucson, which, because of our location near the border, unfortunately, we have a lot of stash houses. I mean, I do understand the Court's concern, and I think the government big picture wise understands the Court's concern. And as this Court said, it's not that it's been a large amount of criticism of this stuff throughout the country, actually. No, no, I'm plugging into a debate of which you are well aware. Yeah, so, but there is some kind of, there is a reason they were doing this. It was to address a problem that was occurring in Tucson. Could I ask a question? Could I ask a question? Oh, please go ahead, Judge Noonan. Yeah. I don't know whether you'd be familiar with a venerable decision of the United States v. Sorrell. That's a decision by Chief Justice Hughes in 1934, where a prohibition agent trapped a citizen into selling him some whiskey. He just asked him a couple of times, and then when the man acceded to his request for the whiskey, he arrested him, and then the man was prosecuted for violating the Prohibition laws, and the Supreme Court said that was just indecent government conduct, setting somebody up. Even though this man had the reputation of being a rum runner, the government had set him up and created the crime, and Chief Justice Hughes is unsparing in his criticism of the government doing that. I don't know whether you'd like to comment on that now, or send us a brief on it. I'm sorry, Judge. I'm not familiar with the case. And like I said, the government as a whole is aware of the criticisms of these procedures. But in this case, the government did its job, and it did its job properly. Well, I wonder if it's necessary simply to burnish the reputation of the Bureau of Alcohol, et cetera. I don't know that they're doing any good for anybody else. In my personal opinion, they're doing a good job under incredible, tough circumstances. Unless the Court has further questions. Okay. Any further questions from the bench? No, thank you. Okay. Thank you very much. Response? We've taken you down. But if you have a response, we will be happy to hear it. Let's put a minute on the clock if you've got a response. I might just have one more short one, expecting the opportunity. No, I don't think I have. Okay. Okay. The case, then, United States v. Pedran, is submitted for decision. Thank both sides for their arguments.
judges: Noonan, Fletcher, Christen